UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL CURRY, a minor, by and through
his parents PAUL AND MELANIE CURRY,

     Plaintiffs,

                                     Case Number: 04-10143

v.                                  Honorable David M. Lawson

SCHOOL DISTRICT OF THE CITY OF
SAGINAW, and IRENE HENSINGER,

     Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The parents of Joel Curry, a fifth-grade student at a public school in Saginaw, Michigan, became upset at Joel's teachers who would not let him display a Christian message on a school project. Taking offense at this perceived slight, they filed a federal lawsuit against the school district and the grade school principal alleging that Joel's constitutional rights were violated. The parties have filed cross motions for summary judgment. The United States filed a brief *amicus curie* on Joel's behalf. The Court heard oral argument on October 6, 2005. The Court now finds that although the defendants did not violate Joel's constitutional rights under the Fourteenth Amendment or the Free Exercise Clause of the First Amendment, the actions did abridge Joel's First Amendment speech rights. However, the plaintiffs have not demonstrated that the school district failed to train its personnel in dealing with such issues or otherwise established municipal liability. In addition, the Court finds that the school principal is entitled to qualified immunity. Finally, the request for declaratory and injunctive relief is moot. Therefore, the Court will deny the plaintiffs' motion for

summary judgment, grant the defendants' motion for summary judgment, and dismiss the case with prejudice.

<div align="center">I.</div>

The parties have stipulated to the facts of this case, which are summarized as follows:

Joel Curry, the plaintiff in this matter through his parents, was a fifth grade student at the Handley School in Saginaw, Michigan during the 2003-2004 academic year. At the time, Bridgitte Benjamin was Joel's homeroom teacher, Lisa Sweebe was his social studies instructor, and Shelly Dawson was his mathematics teacher. As part of the fifth grade curriculum, students participate in an exercise called "Classroom City." Classroom City takes a multi-disciplinary approach to learning by incorporating lessons on literature, marketing, government, civics, economics, and mathematics. The exercise culminates in a three-day event held in the school's gymnasium.

Sweebe, who manages the exercise, sent out packets describing the assignments to students and their parents in early November. The 2003 Classroom City event, which provoked the controversy here, was held on December 11, 12, and 16, 2003. The guidelines for assignment stated:

> You will need to create, market, and sell a product for the simulation Class Room City.
>
> - You cannot sell or use food products.
> - You cannot play or sell games of chance.
> - Your product must be something that is handmade.
> - Materials and supplies cannot exceed $10.00 in cost.
> - You can sell as many as three different products.
> - You will need a sample of your product(s) to do an all[-]school market survey. *You will receive more details from your math teacher concerning the market survey.*
> - Your market analysis will help you determine how much inventory you will need to start your business.
> - Remember as you prepare for your business that part of the spirit of the competition is to have a product that stands out from all the others.

Stip. Facts Ex. 1, Classroom City Project Guidelines.  The assignment also asked students to construct a fictitious city in the gymnasium from cardboard refrigerator boxes.  The students then elected a mayor, city counsel members, several sheriffs, and a postmaster.  The students, either by themselves or with a partner, constructed a storefront and made products to sell during the three-day event.  They also drew up a description of their products in order to purchase a business license. Students advertised their products in the Classroom City newspaper.  Students received a fixed amount of fictitious money to purchase advertising, pay for their business licences, and settle any fines assessed by the elected sheriffs.

Before a product could be approved for sale, students were required to conduct a market survey in advance of the event.  Participants created a prototype of their products, and one-third of the student body decided which products they might purchase at the event.  During the actual three-day event, the entire student body, under the supervision of the physical education instructor, attended Classroom City and made purchases at the mock storefronts with fictitious script.  The stores were monitored to see which one had the most money at the end of the exercise.

Apparently unable to generate his own idea, Joel took the suggestion of his mother and decided to make ornaments made out of pipe cleaners and beads in the likeness of candy canes. Joel's father offered to create cards to attach to the ornaments after finding a glass candy-cane-like ornament in their home that came with a religious conjuration of its symbolism.  Joel's father evidently had given out the glass candy cane ornaments at work.  However, when Joel submitted his ornament prototype for the market survey, he did not attach the card his father offered to make.

Sometime after the market survey was completed, Joel added the card to the ornaments he planned to sell during Classroom City.  The card read:

The Meaning of the Candy Cane
Hard Candy: Reminds us that Jesus is like a "rock," strong and dependable.
The Color Red: Is for God's love that sent Jesus to give his life for us on the cross.
The Stripes: Remind us of Jesus' suffering—his crown of thorns, the wounds in his hands and feet; and the cross on which he died.
Peppermint Flavor: Is like the gift of spices from the wise men.
White Candy: Stands for Jesus as the holy, sinless Son of God.
Cane: Is like a staff used by shepherds in caring for sheep. Jesus leads us and watches over us when we Trust him.
The Letter "J": Is for the Name of Jesus, Our Lord & Savior, born on Christmas day

Stipulated Facts at ¶ 11.  Joel and his parents brought the ornaments to school a few days prior to the event; however, they did not alert school administrators to the addition of the card.  Nonetheless, Joel was not fined by the elected "sheriffs" during subsequent inspections.

Joel's partner for the exercise was a child of Asian Indian descent, Siddarth Reddy.  The two decided that Siddarth would prepare the storefront and Joel would prepare the products to sell. When Siddarth learned of the card, he informed Joel that "[n]obody wants to hear about Jesus." Stipulated Facts at ¶ 15.  Siddarth subsequently decided to make his own products for sale, resulting in his bearing the burden of constructing both the storefront and the product.  During the event itself, Joel manned the storefront during the morning hours and Siddarth during the afternoon.

On December 11, 2003, the first day of the Classroom City event, Jennifer Harris, the gym teacher and student supervisor of Classroom City, sought the counsel of Lisa Sweebe, the event manager, when she discovered that Joel was "selling religious items."  Stipulated Facts at ¶ 17. Sweebe proceeded to Joel's storefront to see what Joel was selling.  Joel showed Sweebe his ornament with the attached card.  Sweebe asked Joel if the card had been attached at the time of the market survey, and Joel indicated that it had not.  Sweebe then looked at Joel's business license and noted that the ornament with the card fell within the product's description.  Although Joel was not subject to a fine on that basis, Sweebe told Joel that he could not sell the card until she had a chance

-4-

to talk with the principal, Irene Hensinger. She further stated that he had done nothing wrong, but she was concerned about the card's religious content and whether other students might be offended. For the rest of the day, Joel sold his ornaments without the card.

Sweebe initially was unable to locate Hensinger and left a message to speak with her. Around 12:20 p.m., Joel's mother arrived at the school. After learning that Joel was not allowed to sell the ornament with the attachment, she spoke to Sweebe. She told Sweebe that the use of the cards fell within Joel's constitutional rights as a student. Joel's mother indicated that she would bring in some literature regarding his rights; Sweebe agreed to review it and pass it along to Hensinger. Joel's mother stated that she knew the card had not been attached to the prototype at the time of the market survey.

Later that afternoon, Sweebe left a note for Hensinger, which contained a copy of the card's content along with the question, "Can this be sold? Mom says this is within Joel's rights? I need your okay." Stipulated Facts at ¶ 24. Eventually, Sweebe discussed the matter with Hensinger; Sweebe also provided Hensinger the information that Joel's mother furnished. Hennsiger, in turn, passed the information on to Dr. John Norwood, the assistant superintendent for school performance.

That evening at home, Joel told his mother that he wished to sell the ornaments with the card so that others could learn about Jesus. His mother believed that Joel had a constitutional right to sell the pipe-cleaner candy canes with the attachment. On December 12, 2003, Joel's mother placed a copy of an article written by attorney Mathew Staver entitled "Students' Rights on Public School Campuses" in Sweebe's school mailbox. She include a note informing Sweebe, "[t]here is just a ton of info on the internet [sic] from various organizations. Some of the groups are even offering free

counsel to anyone who may have questions about students' rights to free speech." Stipulated Facts at ¶ 27.

This article along with the note was forwarded to Dr. Norwood by Hensinger. At some point, between December 12 and 16, 2003, Hensinger finally spoke to Dr. Norwood about Joel's ornament and attached card. Both agreed that the use of the card was inappropriate. On the morning of December 16, 2003, Hensinger met with Joel's mother and informed her that after consideration, the school would not permit Joel to sell the ornaments with the attached card. Hensinger further stated that Classroom City was considered instructional time and because the cards contained religious content, they could not be permitted. If Joel still wished to sell the candy canes with the card, he could do so after school in the parking lot. Joel did not attempt to sell his ornaments with the cards in the parking lot. Instead, he sold the ornaments without the cards during the exercise.

Joel generously received a grade of "A" for his parents' efforts during the assignments and was not disciplined for attempting to sell the candy canes with the religious cards. The parties agree that Hensinger's actions were taken in her official capacity as principal of the school.

During the event itself, students had the "free choice" to buy the various products for sale at the fifty-six mock storefronts. Stipulated Facts at ¶ 9. Therefore, to obtain Joel's ornament, a student would have had to purchase the ornament during the Classroom City event. Parents and non-students were encouraged not to make purchases.

On June 16, 2004, the plaintiffs filed a five-count complaint pursuant to 42 U.S.C. § 1983 alleging violation of the First Amendment's freedom of speech guarantee (count one); violation of the First Amendment's Free Exercise Clause (count two); violation of the Establishment Clause (count three); violation of the Due Process Clause of the Fourteenth Amendment (count four); and

-6-

violation of the Equal Protection Clause of the Fourteenth Amendment (count five). The plaintiffs

seek monetary damages, injunctive relief, and attorneys fees. On January 28, 2005, the parties filed

cross motions for summary judgment. The parties have submitted responses in opposition to the

respective motions, and the Court heard oral argument on the motions on October 6, 2005. The

matter is now ready for decision.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact." Fed. R. Civ. P. 56(c). The parties have filed cross motions for summary

judgment, and neither suggests that there are facts in dispute. Nonetheless, the Court must apply

the well-recognized standards when deciding cross motions; "[t]he fact that the parties have filed

cross-motions for summary judgment does not mean, of course, that summary judgment for one side

or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir.

2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate

each motion on its own merits and view all facts and inferences in the light most favorable to the

nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine

issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences

in favor of the non-moving party and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the

"'record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,'"

-7-

there is no genuine issue of material fact.  *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Because motions were filed by and against both defendants, and the bases of liability are not identical for the two defendants, the Court will examine the evidence as it applies to each one separately.

## A.  School District's liability

To establish a claim under 42 U.S.C. § 1983, the plaintiff must satisfy two elements: (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under of color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003).  Municipalities are considered "persons" within the meaning of section 1983; however, a city "cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Rather, a plaintiff asserting a section 1983 claim against a municipality such as a school board "must show that the School Board *itself* is the wrongdoer." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citations omitted). Therefore, to succeed on their claims against the school district, the plaintiffs "must demonstrate both: (1) the deprivation of a constitutional right, and (2) the School District is responsible for that violation." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Claiborne Cnty.*, 103 F.3d at 505-06).

Among the ways a municipality, such as a school board, can be found to have violated constitutional rights itself under section 1983 are: (1) legislative action by the municipality's legislative body; (2) actions of municipal agencies or boards that exercise authority (such as a board

-8-

of education), *see Monell*, 436 U.S. at 694; (3) actions by individuals with final decision-making authority for a municipality, *see Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989) (holding that "those officials . . . who speak with final policymaking authority for the local governmental actor" can render the municipality itself liable); (4) a municipal policy of inadequate training or supervision, *see City of Canton v. Harris*, 489 U.S. 378, 383 (1989); and (5) a municipal custom, *see Pembaur v. City of Cincinatti*, 475 U.S. 469, 482 n.10 (1986) (observing that a municipality "'may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels'") (quoting *Monell*, 436 U.S. at 690-91).  The plaintiffs do not claim that the school district can be found liable under any of these theories except its alleged failure to train the teachers and principal on dealing with religious issues that might arise during the instructional day.

"To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury."  *Ellis*, 455 F.3d at 700 (citing *Russo v. City of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir.1992)).  In this case, the parties do not dispute the fact that the school district has not provided specific training on how to accommodate religious speech.  Ms. Sweebe, who supervised the Classroom City project, acknowledged in her deposition that she has received no such training, and Ms. Hensinger, the principal, confirmed that there is no written policy on the subject.  Taking the evidence in the light most favorable to the plaintiff, the Court concludes that the first element of the failure-to-train claim is satisfied.

The Court believes, however, that the plaintiffs have not brought forth any evidence that the school district was deliberately indifferent to the issue or that the training shortcoming was a result of indifference on the part of the district. In *City of Canton*, the Supreme Court recognized two fact patterns by which a citizen could establish deliberate indifference. That case involved the training of police officers. The Court first observed that the nature of the officers' duties could be such that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" in not providing training. *City of Canton*, 489 U.S. at 390. The Court identified the need to apprehend fleeing felons and the possession of firearms by officers who might be called upon to use deadly force as indicating to a "moral certainty" that proper training would be required. *Id.* at n.10. Second, municipal employees may have violated constitutional rights so often that the need for further training must have been "plainly obvious to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need." *Ibid*; *see also id.* at 397 (O'Connor, J., concurring) (finding that such behavior constitutes "tacit authorization" of the officers' conduct). The Sixth Circuit regularly applies these factors to failure-to-train claims. *See Ellis*, 455 F.3d at 700-02; *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir.1999).

The plaintiffs in this case have presented no evidence that there has been a series of violations of religious rights at the school or that the school board knew or should have known that they should train teachers in that area. In fact, there is no evidence that there *ever* has been an incident of this type in the school district. In *Ellis*, the court of appeals rejected an argument that ten prior incident reports of teacher abuse established deliberate indifference to the need to furnish training on the subject. *Ellis*, 455 F.3d at 701. In *Thomas v. City of Chattanooga*, 398 F.3d 426,

430-31 (6th Cir. 2005), the court held that evidence of forty-five lawsuits alleging excessive force against the Chattanooga Police Department did not establish deliberate indifference by that department.   This Court cannot conclude in the absence of *any* prior incident of religious confrontation that a jury could find that the need to offer training in the area was "plainly obvious to [district] policymakers," or the failure to train could be ascribed to their deliberate indifference to that need.  *City of Canton*, 489 U.S. at 390 n.10.

Nor have the plaintiffs presented any evidence that the need for training was so obvious that the failure to train would result in a constitutional violation.  There is no evidence from which the Court or a jury could conclude that it was inherently foreseeable that teachers would violate the speech or religious rights of students or that specific training was necessary to avoid the deprivation of constitutional rights.  Although the absence of prior complaints addresses a different aspect of the failure-to-train proofs, that fact also has a bearing on the inherent foreseeability of the issues that might arise in the classroom.  The point, of course, is that the lack of prior incidents reinforces the conclusion that a reasonable administrator cannot be found to have been deliberately indifferent to the need to train for unlikely happenings.  Although a training program of the type the plaintiffs advocate may help school administrators in their tasks, there is no basis for school board liability based on the sole fact that no training existed.

The plaintiffs have not brought forth any evidence supporting municipal liability under section 1983.  Therefore, the school district's motion for summary judgment will be granted and the plaintiffs' motion for summary judgment against this defendant will be denied.

B.  Liability of individual defendant – qualified immunity

-11-

Defendant Irene Hensinger contends that she is entitled to qualified immunity in this case. Qualified immunity is an affirmative defense that protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has held that a claim of qualified immunity must be examined in two steps: "[f]irst, a court must consider whether the facts, viewed in the light most favorable to the plaintiff, 'show the officer's conduct violated a constitutional right,'" and "the court must then decide 'whether the right was clearly established.'" *Solomon v. Auburn Hills Police Dept.*, 389 F.3d 167, 172 (6th Cir. 2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

The Sixth Circuit has expanded that inquiry into a three-step sequential analysis, stating: "The first inquiry is whether the [p]laintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is 'whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 219 (6th Cir. 2004) (quoting *Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002); *see also Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citing *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). That court later explained that although the Supreme Court continues to use the two-step approach, *see Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (per curiam), "'the three-step approach may in some cases increase the clarity of the proper analysis.'" *Swiecicki v. Delgado*, __

-12-

F.3d __, __ (docket no. 05-4036, September 15, 2006) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005).  It appears that when the state actor's conduct is obviously "objectively unreasonable" and violates a constitutional right, the court will "collapse" the last two steps.  *Ibid.* (quoting *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005)).  Where a more exacting analysis of the facts may be necessary, the court tends to employ the third step, since "[i]t is important to emphasize that [the step-two] inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (internal quotes and citation omitted).  However, because the defendant raised the qualified immunity defense, the burden is on the plaintiffs to prove that defendant Hensinger is not entitled to qualified immunity. *Silberstein v. City of Dayton*,  440 F.3d 306, 311 (6th Cir. 2006) (holding that "[o]nce the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity").

### 1.  Constitutional right

In their complaint, the plaintiffs allege that Joel Curry's constitutional rights to free speech, the free exercise of religion, due process, and equal protection were violated.  However, during oral argument on the motion, the plaintiffs' attorney acknowledged that the main thrust of the case was the alleged violation of the boy's First Amendment speech rights.

### a.  Speech

"Ever since the Supreme Court decided *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the notion that students do not 'shed their constitutional rights to freedom of expression at the schoolhouse gate' is beyond debate." *Smith ex rel. Smith v. Mt. Pleasant Pub. Sch.*,  285 F. Supp. 2d 987, 993 (E.D. Mich. 2003).  However, a student's right to

-13-

speak out on public or private matters is subject to limitations.  School administrators have the right, and perhaps the obligation, to prohibit speech that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," or that "would substantially interfere with the work of the school or impinge upon the rights of other students," *Tinker*, 393 U.S. at 509 (internal quotes and citation omitted).  The First Amendment rights of students in school are not as broad as those of adults expressing themselves in public.  *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986) (noting that "[i]t does not follow . . . that simply because the use on an offensive form of expression may not be prohibited to adults making what the speaker considers a political point, the same latitude must be permitted to children in a public school").

The latitude that the Constitution gives school administrators to regulate student speech has depended in large measure on the context in which the speech is made.  Supreme Court and Sixth Circuit precedent has established three general frameworks for analyzing student speech at school. First, when "a student's personal expression . . . [merely] happens to occur on the school premises," *Hazelwood*, 484 U.S. 260, 271 (1988), the speech is analyzed under *Tinker* and may only be censored if it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509 (citation and internal quotation marks omitted). Second, a student's speech that occurs when the school opens up a limited public forum for free expression by students is subject to more restrictions.  *See, e.g., Kincaid v. Gibson*, 236 F.3d 342, 347-49 (6th Cir. 2001) (en banc) (describing different types of fora generally, and holding that college yearbook was limited public forum).  In such a forum, content-based restrictions are allowed, but they must be "narrowly drawn to serve a compelling interest." *Id.* at 348.  Third, student speech that occurs when the school creates, under its auspices, the mechanism for student

-14-

expressive activities such as school plays and publications where the school retains editorial oversight is subject to the most comprehensive restrictions. *Hazelwood*, 484 U.S. at 272-73. In this context, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. The principle that emerges from these cases is that the more likely it is that student speech will be attributed to the school itself, the more control over the content of the speech will be tolerated.

The parties do not agree on which approach ought to be applied in this case. The plaintiffs maintain that the Court ought to apply the more liberal pronouncement of *Tinker*, and the defendants insist that the more restrictive regulation of *Hazelwood* is the appropriate standard because Classroom City is a closed forum. Both arguments have merit. On one hand, the school did serve as the vehicle for the expressive activity and thereby could be considered to have created a closed forum: without Classroom City, an assignment managed by the school, the question of Joel's ornaments would not have arisen. On the other hand, the school could have created a limited public forum by practice. After all, Classroom City was designed to be a mock city that resembled a town's market place where free speech traditionally is allowed. Further, students were encouraged to be creative and come up with a unique product. The Court need not resolve that dispute, however, because the Court finds that the defendant's restriction of Joel Curry's speech cannot be justified even under *Hazelwood*'s more generous standards.

There is no dispute that the religious card attached to Joel's ornament constitutes speech and therefore implicates the First Amendment. The defendants argue that there can be no constitutional violation here because Joel received an "A" for his efforts and was never disciplined for selling the

-15-

cards.  The defendants cite no case law in support of this view, and they appear to ignore the fact that Joel was not allowed to sell his ornaments with the card attached to them.  Therefore, the constitutional deprivation for the purpose of the section 1983 claim was not discipline or Joel's grade, but rather the suppression of speech itself.

The defendants next observe, correctly, that under *Hazelwood*, a school may restrict expressive activities as long as its reasons are reasonably related to pedagogical concerns.  They advance three such concerns: (1) ensuring that the participants learn the lesson the activity is required to teach; (2) eliminating the threat of disruption; and (3) ensuring students views are not mistakenly attributed to the school, which might result in a violation by the school of the Establishment Clause.  None of those concerns are sufficient to permit suppression of the speech in this case.

As for the first concern, the avowed purpose of Classroom City was to teach "literature, marketing, government, civics, economics and math."  Stipulated Facts at ¶ 2.  The Sixth Circuit has found the restriction of speech to be appropriate in instances where the child ignored the assignment in favor of religion or something else.  *See Settle v. Dickson County Sch. Bd.*, 53 F.3d 152, 155-56 (6th Cir. 1995) (holding that the First Amendment was not violated when student was not allowed to write research paper on the life of Jesus Christ where student did not receive permission to change her topic from a paper on drama, did not use the requisite number of sources, and topic was contrary to assignment's purpose of developing research skills by having students write on unfamiliar issues); *DeNooyer v. Merinelli*, No. 92-2080, 1993 WL 477030, at *2 (6th Cir. Nov. 18, 1993) (per curiam) (holding that the First Amendment was not violated when a student was not allowed to show videotaped performance where assignment required a live classroom presentation in order to

-16-

increase students' verbal communication skills).  However, the defendants do not contend that happened here.

Students were permitted to create any product they chose within the limitations of the assignment.  The lessons Classroom City was designed to teach presumably included economics, marketing, civics, and entrepreneurialism.  Standing alone, the candy canes with a religious card attached met those ostensible goals.  Joel came up with a product; he had to market it, sell it, and learn the strategies involved in those pursuits.  There is no evidence that a religious message impeded those goals.  In fact, a religious theme might be viewed as filling a market niche.  Joel would not be the first to discover the commercial allure that religion has brought to capitalism.  It appears that he learned that lesson well by ascribing a religious – albeit unoriginal and inaccurate – aura to an historically secular object to enhance its marketability.  The school made the choice not to limit the products that students could make outside of a few established guidelines.  The exercise and its objectives did not preclude incorporating religion.  There is no evidence that a child's use of a religious products would prevent other students from learning what the assignment was designed to teach.  The concern that the religious message on Joel's product would interfere with the pedagogical exercise is not a legitimate basis on which to restrict his speech.

Next, if the principal's pedagogical concern was disruption, then that defendant has provided no real evidentiary basis for any such concern.  Joel's partner stated that no one wanted to learn about Jesus and chose on that basis to sell a different product during Classroom City.  The insistence of Joel and his parents that the card be attached to the candy canes perhaps was insensitive and intolerant of the diverse cultural background of Joel's partner; and it upset the arrangement the two boys made by requiring Siddarth to make his own product after he already had constructed the

-17-

storefront (his half of the assignment). But this did not cause a disruption in the common sense of the word, nor is there any other evidence of disruption. There is no deposition testimony, for example, that in the past the school has had problems with religious-related materials during the event and that allowing the sale of products bearing a religious imprint gave rise to disruption. *Compare Melton v. Young*, 465 F.2d 1332, 1335 (6th Cir. 1972) (upholding a ban on the wearing of clothing depicting the Confederate flag based on *Tinker*'s rationale upon on a finding that the display of that flag could cause disruption and racial unrest in a newly-integrated high school), *with Castornia v. Madison County Sch. Bd.*, 246 F.3d 536, 540 (6th Cir. 2001) (reversing summary judgment for school board and holding that a ban on wearing clothing displaying the same symbol, which the plaintiffs wore ostensibly to express their "southern heritage," must be analyzed under the rules set forth in *Tinker* as to when public schools may regulate speech). It is undisputed that classmates and the student body were free to purchase products from any of fifty-six different storefronts and that they were also free not to buy products at all. On this record, the defendants have cited no more than an "undifferentiated fear or apprehension of disturbance[, which] is not enough to overcome the right to freedom of expression." *Tinker*, 393 U.S. at 508.

The defendant's third concern – fear of an Establishment Clause violation – presents a closer question. The Establishment Clause of the First Amendment provides that a state "shall make no law respecting an establishment of religion." U.S. Const. amend. I. Just last term, the Supreme Court reiterated the purposes underlying the Establishment Clause:

> The touchstone for our analysis is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."

-18-

*McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, ___ 125 S. Ct 2722, 2733 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)).  It is well settled that if the government engages in conduct, the "ostensible" and "predominant"  purpose of which is to "advan[ce] religion, it violates the central Establishment Clause value of official religious neutrality, there being no neutrality when the government's . . . object is to take sides." *Ibid.* (citing *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987)).

When the State demonstrates "a purpose to favor one faith over another, or adherence to religion generally, [it] clashes with the understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens." *Ibid.* (quoting *Zelman v. Simmons Haris,* 536 U.S. 639, 718 (2002)) (internal quotation marks omitted).  Moreover, government conduct that seems to favor religion "sends the . . . message to . . . nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members." *Ibid.* (quoting *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (internal quotation marks omitted).

The defendant in this case insists that she was obliged to censor Joel's religious speech because it was part of an assignment in which the content would be exposed to other students and parents, and the school was required to take pains to avoid the appearance of endorsing the religious sentiments of the product.  This tension between the free expression rights of an individual and the Establishment Clause obligations of a state authority was discussed in *Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753 (1995), where the Supreme Court observed that "[t]here is a crucial difference between *government* speech endorsing religion, which the Establishment

Clause forbids, and *private* speech endorsing religion which the Free Speech and Free Exercise Clauses protect." *Id.* at 765 (internal citation and quotation marks omitted). As the Court explained, "[r]eligious expression cannot violate the Establishment Clause where it (1) is purely private and (2) occurs in a traditional or designated public forum, publically announced and open to all on equal terms." *Id.* at 770.

That religious views are private and thus constitutionally protected, however, does not guarantee them a "forum on all property owned by the State." *Id.* at 761. That is, private religious views that otherwise are constitutionally protected under the First Amendment's free expression provisions or Free Exercise Clause may find Establishment Clause rebuke when the State provides the vehicle for their expression and the forum is not one traditionally open. *Ibid.* Under those circumstances, private religious views may become the State's.

The reason the question is close in this case is that reasonable people could view the nature of the forum – the Classroom City environment – in different ways. To the extent that forum is open, the danger of attributing private religious views to the State is minimal. The danger, however, increases where the forum is closed. And all of this must be considered in light "of the fact that [the Supreme Court] ha[s] been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden v. Perry*, __ U.S. __, __ 125 S. Ct. 2854, 2863-64 (2005) (internal citation and quotation marks omitted).

A school could be classified as a closed forum, and since the school retains control over the forum, religious expression might be attributable to the school as a state actor. For instance, in *Lee v. Weisman*, 505 U.S. 577 (1992), school principals invited clergy members from different faiths to deliver prayers at high school graduations. The Court found that the prayers would be attributable

-20-

to the school.  *Id.* at 587 ("A school official, the principal, decided that an invocation and a benediction should be given; this is a choice attributable to the State . . . .  The principal chose the religious participant, here a rabbi, and that choice is also attributable to the State.").  At other times, a school may be viewed as a limited public forum, relaxing Establishment Clause concerns.  *See Good News Club v. Milford Central School,* 533 U.S. 98 (2001).  In *Good News Club*, a school was open after hours for "social, civic, and recreational meetings  and entertainment events, and other uses pertaining to the welfare of the community."  *Id.* at 102.  The Good News Club, a private organization for children age six to twelve, asked to hold its weekly after-school meetings in the school's cafeteria.  *Id.* at 103.  Fearing an Establishment Clause violation, the school superintendent formally denied the request, comparing the proposed activities to religious worship.  *Ibid.*  The Court found those concerns unwarranted because the school had opened up a limited public forum to discuss a host of issues.  *Id.* at 111-12.  As long as the Good News Club was wiling to remain within the permissible scope of topics the forum was created to discuss, the school constitutionally could not exclude them.  *Ibid.*  The Court stated:

> [S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

*Id.* at 112.

The validity of State censorship of private religious speech based on concerns of an Establishment Clause violation, therefore, turns on whether the private speech can be attributed to the State, that is, whether the State appears to have endorsed a religious message.  The Supreme Court has not offered a single, consistently-applied test that lower courts might apply to assist in

making such determinations.  Last term, the Supreme Court acknowledged, "Over the last 25 years, we have *sometimes* pointed to *Lemon v. Kurtzman*, 403 U.S. 602 [1971], as providing the governing test in Establishment Clause challenges."  *Van Orden*, __ U.S. at __, 125 S. Ct. at 2860-61 (emphasis added).  The Court then discarded the test in that case – dealing with a display of the Ten Commandments on public property – as "not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds."  *Id.* at 2861.

In this Circuit, however, the preeminent test to apply in Establishment Clause cases remains the one announced in *Lemon*.  *See Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002) ("While we have recognized that individual Supreme Court justices have expressed reservations regarding the *Lemon* test, *see American Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n.15 (6th Cir. 2001) (collecting opinions), we are an intermediate federal court and are bound to follow this test until the Supreme Court explicitly overrules or abandons it.").  The *Lemon* test requires the court to consider whether (1) the government activity in question has a secular purpose, (2) the activity's primary effect advances or inhibits religion, and (3) the government activity fosters an "excessive entanglement" with religion. *Lemon*, 403 U.S. at 612-13. The Sixth Circuit has acknowledged that the Supreme Court occasionally has articulated what has come to be known as the "endorsement test," but this test has never been considered as replacing the three-pronged analysis prescribed by *Lemon*: "While we have variously interpreted the endorsement test as a refinement or modification of the first and second prongs, a clarification of the first prong, and as a modification of the entire *Lemon* test, we follow our en banc decision in *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992), and the recent panel decisions in *Brooks v. City of Oak Ridge*, 222 F.3d 259, 264 (6th

Cir. 2000), *cert. denied*, 531 U.S. 1152 (2001), and *Granzeier* [*v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999)], and treat the endorsement test as a refinement of the second *Lemon* prong." *Adland*, 307 F.3d at 479 (citations omitted). Justice O'Connor made the point in *Lynch v. Donnely*, 465 U.S. 668 (1984), writing in her concurring opinion:

> Focusing on the evil of government endorsement or disapproval of religion makes clear that the effect prong of the *Lemon* test is properly interpreted not to require invalidation of a government practice merely because it in fact causes, even as a primary effect, advancement or inhibition of religion. The laws upheld in *Walz v. Tax Commission*, 397 U.S. 664 (1970) (tax exemption for religious, educational, and charitable organizations), in *McGowan v. Maryland*, 366 U.S. 420 (1960) (mandatory Sunday closing law), and in *Zorach v. Clauson*, 343 U.S. 306 (1952) (released time from school for off-campus religious instruction), had such effects, but they did not violate the Establishment Clause. What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion. It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community

*Id.* at 691-92 (O'Connor, J., concurring).

The Court concludes, therefore, that the validity of the defendant's Establishment Clause concern in this case must be measured against the second prong of the *Lemon* test as refined by the endorsement test, which asks "whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government." *Adland*, 307 F.3d at 479. Put another way, the question is whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *Allegheny County v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 597 (1989) (opinion of Blackmun, J.) (internal citation and quotation marks omitted).

Based on the undisputed facts, the Court finds that no reasonable observer would attribute to the school the religious message on the card attached to the candy cane ornament.  It is true that Joel's product had to be approved based on a prototype submitted during the marketing survey portion of the assignment, and Ms. Sweebe had the authority to allow or disallow products that did not meet the project's criteria.  However, it is undisputed that at the time of the market survey, Joel had not yet attached the religious cards.  Moreover, Classroom City should be viewed by the reasonable observer as creating a limited public forum, since the exercise was designed to be a mock city where different products and viewpoints converge on the streets and in commerce.  A product bearing a religious card certainly would be allowed in a city's marketplace.

In addition, Classroom City ostensibly was designed for a secular purpose: it takes a multi-disciplinary approach to learning by incorporating lessons on literature, marketing, government, civics, economics, and mathematics.  The mock city included some fifty-six storefronts.  It cannot be argued reasonably that allowing the sale of ornaments had the primary effect of advancing religion.  Any effect of the sale of the cards was minimal at best.  Students from other grades were free to tour the mock city as they wished and were not required to purchase any products from any storefront.  Nor were students encouraged to purchase any particular product.

Allowing the sale of the card along with the ornament would not have been perceived by a casual observer as an endorsement of a religious message by the school.  The Court finds that the defendant's concern over an Establishment Clause violation was not a valid reason to curtail Joel Curry's speech rights.  Therefore, the plaintiffs have established a violation of a constitutional right under the First Amendment's free speech protection.

b.  Free Exercise Clause

-24-

The plaintiffs also argued in their pleadings that the defendant's actions inhibited the student's free exercise of his religion.  However, at oral argument, the plaintiffs agreed that the free exercise claim was subsumed in the free expression claim.  The Court agrees that analyzing the claim as a free speech case is more appropriate.  There was no compulsion by the school concerning any particular form of religious belief, nor was there any penalty or burden imposed on the plaintiffs for performing or refusing to perform an act that they believed was violative of their religious convictions.  "[The] purpose [of the Free Exercise Clause] is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority.  Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 223 (1963); *see also Mozert v. Hawkins County Bd. of Educ.*,  827 F.2d 1058, 1066 (6th Cir. 1987) (stating that "[i]t is clear that governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion, is the evil prohibited by the Free Exercise Clause").  The plaintiffs have not proved a violation of the Free Exercise Clause.

### c.  Equal Protection Clause

The plaintiffs also de-emphasized their equal protection claim at oral argument.  They have pointed to no law, regulation, statute, ordinance, or regulation that was applied unequally to Joel Curry in this case.  Given the finding that the plaintiffs' free speech rights under the First Amendment were violated, the Court need not address the Equal Protection claim.

### d.  Due process

The plaintiffs have argued that the defendant's decision to prohibit the sale of the religious card violated the Due Process Clause because it was based on vague standards and was not taken pursuant to any written policy or regulation.  The Sixth Circuit has explained the doctrine of vagueness as follows:

> "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that Rockford's antinoise ordinance was not unconstitutionally vague). Vague laws are problematic because they (1) "may trap the innocent by not providing fair warning," (2) fail to "provide explicit standards for those who apply them," and (3) threaten "to inhibit the exercise of [First Amendment] freedoms." *Id.* at 108-09 (quotation marks and footnote omitted). A law must therefore "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108.
>
> The Supreme Court has explained that, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Id*. at 110.

*Deja Vu of Cincinnati, L.L.C. v. Union Tp. Bd. of Trustees,* 411 F.3d 777, 798 (6th Cir. 2005).

The crux of the plaintiffs' claim here is that there is some affirmative duty on the school district's part to make a written policy on class assignments and religious content. The plaintiffs, however, cite to no authority in support of this novel proposition.  Moreover, the Supreme Court has rejected a notion that a school must act pursuant to a written policy when it deals with constitutional issues likely to arise in a school environment.  *See Hazelwood*, 484 U.S. at 273 n.6.  ("We reject respondents' suggestion that school officials be permitted to exercise prepublication control over school-sponsored publications only pursuant to specific written regulations. To require such regulations in the context of a curricular activity could unduly constrain the ability of educators to educate.").  The Court concludes, therefore, that the plaintiffs have not proved a violation of constitutional rights based on the Due Process Clause.

2.  Whether right is clearly established

Having determined that the plaintiffs have proven a violation of Joel Curry's free speech rights, the Court next must determine whether the rights were clearly established at the time "such that a reasonable official would have understood that [her] behavior violated that right"; and whether the plaintiffs have offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights." *Tucker*, 388 F.3d at 219.  In this case, the right to be free to speak on ideas and beliefs in a school setting is clearly established.  But the qualified immunity defense requires the Court to look beyond the right in the abstract.  The Supreme Court has acknowledged that "[i]t is sometimes difficult for [a public official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts." *Saucier*, 533 U.S. at 205.  Qualified immunity protects municipal personnel who must operate along the "hazy border" that divides acceptable from unreasonable conduct.  *Id.* at 206.

Although the Sixth Circuit has not directly addressed qualified immunity in First Amendment school cases, it has found the defense to be available where constitutional precedent has not been a model of clarity.  *See Sallier v. Brooks*, 343 F.3d 868 (6th Cir. 2003).  The Fifth Circuit has held that a school administrator was entitled to qualified immunity despite a finding of a First Amendment speech violation because of "the unsettled nature of First Amendment law as applied to off-campus student speech inadvertently brought on campus by others." *Porter v. Ascension Parish School Bd.,* 393 F.3d 608, 620 (5th Cir. 2004).

In this case, the Court finds that the First Amendment speech rights of a student to make religious statements in a quasi-classroom setting were not clearly established at the time of the incident.  As noted earlier, the Supreme Court has articulated at least three different tests to be

-27-

applied to speech restrictions in the academic arena.  The nature of Classroom City defies an easy categorization as to the type of forum it created, and therefore the school administrator reasonably could not be expected to identify the subtle distinctions that differentiate one type of forum that resulted or the appropriate test that should be applied.

The plaintiffs argue that the state of the law is clear and that the principal here was simply ignorant of the law.  The third step of the inquiry, however, requires that the plaintiff offer sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Feathers*, 319 F.3d at 848 (internal citation and quotation marks omitted).  The plaintiffs simply have made conclusory allegations that the law, as they see it, is clearly established.  In so doing, the plaintiffs fail to point to evidence suggesting the objective unreasonableness of the principal's actions.

Rather, the Court finds that the principal did not act unreasonably when she prohibited Joel from selling the ornaments with the religious cards attached.  There is evidence that the principal has received a law degree, but that fact may serve to complicate the matter.  Ms. Hensinger had to make a difficult choice in a complicated situation.  That she was expected to apply several constitutional tests to determine the correct legal answer would be daunting even in an ideal situation.  Her knowledge of the law no doubt sensitized her to her obligations under the Establishment Clause, which under some circumstances may serve as a compelling government interest and therefore constitutionally  justify a free speech violation. *See Widmar v. Vincent*, 454 U.S. 263, 271(1981) ("We agree that the interest of the University in complying with its constitutional obligations [under the Establishment Clause] may be characterized as compelling.").  According to the stipulated facts, Ms. Hensinger first  sought advice from the school superintendent,

and only then did she finalize her decision to disallow the religious cards. Thereafter, Joel was told that he could distribute the cards after school in the parking lot. Balancing obligations under the Establishment Clause and the free speech provisions of the First Amendment in this case placed the defendant squarely upon the "hazy border" that divides acceptable from unreasonable conduct. *Saucier*, 533 U.S. at 206. This appears to the Court to be precisely the type of case for which the qualified immunity defense was intended.

## C. Injunctive relief

In their complaint, the plaintiffs requested that the Court "issue [p]reliminary and [p]ermanent [i]njunctions enjoining [d]efendants . . . from violating Joel's constitutional rights by banning religious expression that otherwise fulfills classroom assignments." Compl. at 14. The plaintiffs also requested declaratory relief. Although the Court finds that defendant Hensinger is entitled to qualified immunity, that defense shields her from damages only, not from declaratory or injunctive relief. *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) (stating that "qualified immunity protects officials from individual liability for money damages but not from declaratory or injunctive relief"); *Littlejohn v. Rose*, 768 F.2d 765, 772 (6th Cir.1985).

The Court finds, however, that the request for declaratory and injunctive relief is moot because Joel matriculated out of the Hadley Middle School in 2004 (he was a fifth grader in December 2003 when he participated in the Classroom City project) and the injunction he seeks could provide no meaningful relief. In *Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026 (6th Cir. 1995), the court considered an appeal of a preliminary injunction in favor of high school track competitors challenging the application of eligibility rules to them. The court determined that the issue was moot, reasoning:

-29-

> The 1995 track season has ended, and thus the plaintiffs will have no more races to run. The "capable of repetition yet evading review" exception to mootness does not apply to these plaintiffs because the exception requires not only that the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, but also that there was a reasonable expectation that the same complaining party would be subjected to the same action again. . . . At oral argument, we learned that Sandison and Stanley graduated from high school in June 1995, which precludes the repetition of another controversy over whether these same plaintiffs may run on their high school teams.

*Id.* at 1029-30 (internal citations and quotation marks omitted). *See also Hooban v. Boling*, 503 F.2d 648, 650 n.1 (6th Cir. 1974) (holding that request for injunctive relief in civil rights action by law student alleging that his classification by university as an out-of-state student for tuition purposes violated equal protection clause and his right to travel was moot because the law student had graduated from law school).

Other courts have held that in similar circumstances, a damage claim will save the lawsuit itself from a mootness challenge, but injunctive relief may not be awarded. *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (injunctive relief could no longer redress the injury and the "capable of repetition, yet evading review" doctrine did not apply, but plaintiff's nominal damages claim saved action from mootness); *Mellen v. Bunting*, 327 F.3d 355, 364-65 (4th Cir. 2003) (plaintiffs' claim for injunctive relief arising from challenge to constitutionality of supper prayer at Virginia Military Institute became moot upon the plaintiffs' graduation but the damages claim continued to present a live controversy); *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 218 (3d Cir. 2003) (although a student's First Amendment claims for injunctive and declaratory relief became moot upon her graduation, her damages claim continued to present a live controversy); *Doe v. Madison Sch. Dist. No. 321*, 177

F.3d 789, 798 (9th Cir. 1999) (en banc) ("A student's graduation moots claims for declaratory and injunctive relief, but it does not moot claims for monetary damages.").

The precedents require, therefore, that the Court deny the plaintiffs' request for declaratory and injunctive relief as moot.

<div align="center">III.</div>

The Court finds that the undisputed facts demonstrate that the plaintiffs may not recover against the Saginaw School District on their failure-to-train theory. Although the plaintiffs have shown that the individual defendant engaged in conduct that violated plaintiff Joel Curry's speech rights under the First Amendment, the individual defendant is entitled to qualified immunity as a matter of law. The requests for declaratory and injunctive relief are moot.

Accordingly, it is **ORDERED** that the plaintiffs' motion for summary judgment [dkt #25] is **DENIED** and the defendants' motion for summary judgment [dkt #22] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: September 18, 2006

<div style="border:1px solid black; padding:10px; width:50%; margin:auto; background:#d3d3d3">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 18, 2006.

s/Felicia Moses
Case Manager

</div>